IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAVAR STEWART, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:16-CV-01321-NJR |
| | ) |
| JACQUELINE LASHBROOK, | ) |
| MICHAEL D. SCOTT, KIMBERLY | ) |
| FERRARI, and WEXFORD HEALTH | ) |
| SOURCES, INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion for Summary Judgment (Doc. 134) ("Wexford MSJ") filed by Defendants Michael D. Scott ("Scott"), Kimberly Ferrari ("Ferrari") and Wexford Health Sources, Inc. ("Wexford") (collectively, "Wexford Defendants"), as well as a Motion for Summary Judgment (Doc. 138) ("IDOC MSJ") filed by Defendant Jacqueline Lashbrook ("Lashbrook"). For the reasons set forth below, the Court grants the IDOC MSJ and denies the Wexford MSJ.

### FACTUAL AND PROCEDURAL BACKGROUND

This action stems from medical treatment given to Plaintiff Javan Stewart ("Stewart") by Defendants while Stewart was an inmate incarcerated at Pinckneyville Correctional Center, a facility operated by the Illinois Department of Corrections ("IDOC"). At all times relevant to this action, Wexford provided health care services to inmates at IDOC facilities, including Pinckneyville, pursuant to a contract with IDOC and

the Illinois Department of Healthcare and Family Services (Doc. 60). Under that contract, Wexford was required to "[a]ggressively manage all off-site services for appropriate utilization and cost effectiveness," as well as to provide "appropriate staffing levels" and "provide staff during all hours scheduled in [the] staffing schedules" (Doc. 146-1 at 4, 20).

Ferrari is a licensed practical nurse and was a Wexford employee at Pinckneyville during the period in question (Doc. 135 at 3). Scott is a medical doctor licensed in Illinois and was employed by Wexford at Pinckneyville during the period in question (Doc. 135-3 at 3; Doc. 59 at 2). Lashbrook was warden of Pinckneyville during the period in question (Doc. 138 at 2).

On February 12, 2016, Stewart injured his right knee after slipping into a wall at Pinckneyville (Doc. 135-1 at 11). Stewart indicates that immediately after the injury, he was unable to stand and was placed in a chair at a C/O station while medical assistance was brought to him (*Id.* at 12-13). Approximately 15-30 minutes after receiving this injury, Stewart was examined by Ferrari at the C/O station (*Id.* at 13). Ferrari later indicated that she examined Stewart's knee and noted that it was out of alignment and showed swelling above the knee-cap and restricted range of motion, but that there was no edema or discoloration and the skin integrity was within normal limits (Docs. 135-2 at 6; 136-1 at 3). Ferrari's notes indicate that she referred Stewart to be seen by the next available physician and that Stewart reported his pain level as being four on a 10-point scale (Doc. 136-1 at 3). In her deposition, Ferrari later indicated that did not believe the injury was one that needed to be seen immediately by a physician (Doc. 135-2 at 6). Stewart later stated that he had reported his pain as being 14 on a 10 point scale and that Ferrari told

him that he could not be seen by a doctor immediately because it was a holiday weekend (Doc. 135-1 at 14). Ferrari gave Stewart ibuprofen, a cold pack, a bandage wrap, and a low-bunk permit so that he would not need to climb to an upper bunk before seeing the physician (Docs. 135-2 at 11; 136-1 at 3). Ferrari later indicated that she felt this treatment was appropriate because Stewart could walk on his leg, had no edema, normal vital signs, and "all [he] had was a knot above the kneecap" (Doc. 135-2 at 7). Stewart later stated that Ferrari had brought him from the C/O station to the health care unit by wheelchair and that his mobility was restricted, forcing him to walk backwards (Doc. 135-1 at 14).

Scott was the on-call physician from February 12-14, 2016, and could have ordered emergency room treatment if a nurse had informed him that an inmate had an injury that had to be treated urgently (Doc. 135 at 5). Lashbrook stated that on the day Stewart injured his knee she "observed him sitting on a box in the front of the gallery" and, at that time, "told staff members to make sure [his] injury was treated as an emergency and to make sure he was seen by a doctor or taken to the hospital" (Doc. 21 at 8-9).

Scott saw Stewart on February 16, 2016, and observed that Scott was in a wheelchair at that time (Doc. 135-3 at 11). Scott determined that there was swelling on Stewart's right knee and a depression over the patella ligament area and that the right patella was higher than the left, among other findings (*Id.*). Based on these findings, Scott prescribed an x-ray of Stewart's right knee, with bandage wraps and a cane to assist Stewart until the x-ray could be reviewed (*Id.*). Scott assessed the injury to be non-urgent because it did not involve a weight-bearing bone and, in his view, Stewart could walk despite the injury (*Id.* at 24). Stewart was issued the cane on February 16, and he indicated

that with the assistance of the cane he was able to walk (Doc. 135-1 at 19). Stewart was x-rayed when a technician was next available, on February 17, and Scott reviewed his x-rays and determined that Stewart had fractured his right knee (Doc. 135-3 at 12).

Based on this finding, Scott prescribed Tylenol for Stewart's pain and planned to present Stewart's case for "collegial review," a process through which a site physician and a Wexford physician confer to determine the medical necessity of obtaining medical care (Docs. 135-3 at 12; 136-2 at 6). Collegial review occurred every Monday at Pinckneyville, and Scott presented Stewart's case at the next scheduled collegial review on February 22 (Doc. 135-3 at 13). For urgent matters, collegial review could be requested outside of the ordinary schedule (*Id.* at 19-20).

Stewart recalls speaking with Lashbrook on February 22 or 23, 2016 (Doc. 135-1 at 39). Stewart told Lashbrook that he had broken his knee and was in "a little pain," and confirmed upon Lashbrook's request that he had met with medical professionals and was being treated (*Id.* at 40). At the time of the conversation, Stewart was on medication, he was using a cane, and his knee was wrapped in an ace bandage (*Id.*). Lashbrook did have ultimate authority over the health care program at Pinckneyville (Doc. 138-1 at 5), but she later indicated that she was not responsible for the work schedules of medical personnel, and that Wexford predominantly made decisions regarding medical staffing (*Id.* at 8-9). Stewart's medical furlough paperwork for his appointments at the Orthopedic Institute and his surgery were both signed with Lashbrook's name, yet Lashbrook indicated that she had never seen either document and it was standard practice for her designee to sign documents for her (*Id.* at 14).

Scott saw Stewart again on February 29, at which time he notified Stewart of his referral for orthopedic evaluation and continued the prescription for Tylenol (*Id.* at 13). Stewart was taken on March 7 for an orthopedic evaluation at the Orthopedic Institute of Southern Illinois, conducted by Orthopedic Surgeon Dr. Charles Wood, who recommended surgery. Wood also noted that Stewart reported pain of three on a 10-point scale and stated that he could walk (Doc. 136-3 at 3-4). Scott then submitted a request for surgery for Stewart, and that request was approved by collegial review on March 14, 2016 (Doc. 135-3 at 14).

On March 14, 2016, Stewart was seen at sick call by a nurse who noted Stewart's complaint of throbbing pain of ten on a 10-point scale and his treatment with Tylenol. The nurse referred Stewart to Dr. Scott for him to consider renewing Stewart's medication (Doc. 136-1 at 15). Later that day, Scott prescribed Naprosyn for Stewart (Doc. 135-3 at 14), and Scott later noted that Stewart's orthopedic treatment had been approved the same day (Doc. 136-1 at 16).

Stewart was seen two weeks later at sick call by Nurse Ferrari, who noted the date if his injury, indicated that he still had a restricted range of motion, and referred him to a physician due to his request for medication, which she could not fulfill (*Id.* at 17). Scott reviewed Stewart's chart the same day and noted that Stewart was scheduled for surgery on March 30, 2016 (*Id.* at 21).

During the surgery on March 30, Wood observed that a significant amount of scar tissue had formed around the fracture (Doc. 136-3 at 4). Wood removed this tissue in order to allow it to heal (*Id.*). Wood did not observe any complications from the surgery

(*Id.* at 5), but indicated that the delay between Stewart's injury and treatment may have prolonged Stewart's recovery period (*Id.* at 7). Wood indicated that, in his experience, 80-90% of patella fractures were treated within one week (*Id.*).

After his operation, Stewart had a series of follow-up appointments with medical personnel at Pinckneyville, including Scott, and attended some physical therapy between May 26, 2016, and August 3, 2016 (Doc. 136-1 at 55-74). Stewart indicated that he ceased his physical therapy after disagreements with medical personnel regarding the intensity of the therapy (Doc. 135-1 at 25-27).

Stewart filed this action on December 8, 2016 (Doc. 1).[1] Certain counts and defendants have subsequently been dismissed (Docs. 121, 154), leaving Stewart proceeding on the following claims:

- Count I: Deliberate Indifference against Lashbrook
- Count II: Deliberate Indifference against Ferrari
- Count III: Deliberate Indifference against Scott
- Count IV: Deliberate Indifference against Wexford

Wexford, Ferrari, and Scott jointly filed the Wexford MSJ and accompanying memorandum and exhibits on May 29 and May 30, 2020 (Docs. 134-136). Lashbrook filed the IDOC MSJ on June 5, 2020, adopting in part the statement of facts in the Wexford memorandum (Doc. 138). Stewart responded on July 27, 2020 (Doc. 146), and the Wexford

---

[1] The Court recruited counsel to assist Stewart on November 15, 2017 (*see* Docs. 41, 45).

defendants and Lashbrook filed reply briefs on August 10 and 19, respectively (Docs. 147, 150).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317,232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence[.]" *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

**DISCUSSION**

*A.     Applicable Law*

To succeed on a claim based on deliberate indifference in the context of medical services, an inmate must demonstrate (1) an objectively serious medical need and (2) that defendants had a subjectively culpable state of mind in acting or failing to act in disregard of that risk. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

A medical need may be deemed serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). A medical condition "need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

To establish that prison medical staff acted with a subjectively culpable state of mind, an inmate need not show that harm was actually intended, but merely that "defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Id.* (quoting *Greeno*, 414 F.3d at 653). Medical professionals are entitled to deference when acting in their professional capacities, and inmates face a heavy burden when bringing claims of deliberate indifference against them. *Id.* "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually

did not base the decision on such a judgment." *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). Merely negligent conduct will not rise to this level—rather, such conduct must reach a level "showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821-822 (7th Cir. 2012) (quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006)).

**Count I: Deliberate Indifference against Lashbrook**

Lashbrook argues that she is entitled to summary judgment because: (1) Stewart cannot provide evidence showing she was aware of and consciously disregarded an objectively serious risk to his health; (2) Stewart cannot show Lashbrook was involved in determining Scott's schedule, and, even if she was, Scott was on call and available to provide treatment; and (3) Stewart cannot provide evidence showing Lashbrook was involved in approving Stewart's medical furloughs or that she in any way delayed treatment.

It is apparent that Lashbrook was aware of Stewart's injury, having observed him on the day of the injury and having spoken with him again roughly ten days later, around February 22. On the day of the injury, Lashbrook told personnel to ensure that he was seen by medical staff and treated. Around February 22, she confirmed that he had seen medical staff and was undergoing treatment. While Lashbrook does have overall control of health care at Pinckneyville, she herself is not a medical professional, and she is entitled to defer to medical staff absent indications of an emergency or some clear departure from medical norms. Stewart contends that factual issues should prevent summary judgment due to the conversation that he remembers having on February 22—if Lashbrook did

indeed say that she would "make sure" his meals were brought to him and that he was sent out to a doctor for surgery if needed, then her failure to do so would amount to deliberate indifference, Stewart argues.

The Court looks skeptically at this argument. If the conversation between Stewart and Lashbrook did in fact occur on February 22, Lashbrook's main focus seems to have been checking that Stewart had been seen by medical staff and that he had been treated. Having confirmed that Stewart was undergoing treatment, Lashbrook had little reason to suspect that her personal intervention was necessary. While she could doubtless have intervened personally to ensure that Stewart's surgery was timely scheduled, she was not unjustified in assuming that the medical staff already attending to Stewart would take care of this according to longstanding procedures.

As for the failure to ensure that Stewart's meals were delivered to him, the Court is not inclined to view the additional pain that Stewart suffered from having to walk to get his meals as a medical need sufficiently serious to permit a deliberate indifference claim. Even if it were, Lashbrook's failure to follow up does not seem by itself sufficient to permit a claim given her knowledge that other responsible medical staff beneath her were already attending to Stewart's case.

Accordingly, the Court grants summary judgment to Lashbrook on Count I.

**Count II: Deliberate Indifference against Ferrari**

Ferrari argues that summary judgment is warranted because there is no evidence that her medical decisions were a departure from accepted nursing standards. Stewart concedes that she met with him on only two occasions, but claims that her performance

on these two instances creates factual issues that preclude summary judgment. First, Scott notes that Ferrari failed to consult with Scott, who was on call, instead instructing Stewart to return to the health care unit in three days. Second, Ferrari and Stewart give differing accounts of the level of pain that Stewart indicated, with Ferrari recording Stewart self-reporting a pain level of 4 out of 10, and Stewart stating that he in fact said 14.

It is entirely possible that a fact-finder might ultimately conclude that Stewart's later statement regarding his self-reported pain level is implausible, or that it would have been understandable for Ferrari to misinterpret 14 as 4. Similarly, it is possible that a fact-finder might conclude that Ferrari's decision not to call a physician but rather to have Stewart wait three days for treatment did not drastically depart from the standard of care or show deliberate indifference, even though Stewart was largely immobile and in significant pain at the time. At this stage, however, the facts presented regarding the interactions between Ferrari and Stewart are not so clear as to permit summary judgment.

For this reason, the Court denies summary judgment to Ferrari.

**Count III: Deliberate Indifference against Scott**

Scott similarly argues that there is no evidence that he acted outside of his professional judgment or was deliberately indifferent. Stewart argues that Scott should have sought to expedite his treatment, requesting immediate collegial review and personally examining Stewart rather than renewing his medications without an examination.

During the period that Scott treated Stewart, Stewart was largely mobile, and he generally self-reported his pain as merely moderate, except for his report of ten on the

pain scale on March 14. Scott was consistently responsive to Stewart's condition and took clear steps to ensure that he did receive treatment according to established protocols. Scott did not choose to expedite Stewart's treatment, basing that decision on clearly enunciated professional reasoning.

Ultimately, it is hard to point to a particular instance in which Scott's care was lacking, but the overall trend in Stewart's treatment seems to have been delay—there was delay in Stewart being seen by Scott, delay in Stewart receiving an x-ray, delay in Stewart being seen by an outside specialist, and delay in scheduling and performing Stewart's surgery. While any one of these delays might individually be quite justifiable, taken as a whole the total delay in Stewart's treatment and Scott's awareness of that delay as it occurred creates a factual issue and could potentially permit a finder of fact to conclude that Scott's insistence on following established procedures and failure to take steps to expedite treatment amounted to deliberate indifference.

Accordingly, the Court denies summary judgment to Scott.

**Count IV: Deliberate Indifference against Wexford**

Wexford had no direct involvement with Stewart's treatment. The Supreme Court, however, established liability for municipalities under 42 U.S.C. § 1983 for constitutional violations resulting from a "policy or custom" in *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978), and the Seventh Circuit has subsequently applied this holding to private corporations like Wexford which act under the color of state law. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d. 954, 966-67 (7th Cir. 2019).

To bring a claim based on an alleged policy of an entity such as Wexford, a plaintiff must first demonstrate that his injury was caused by the policy in question. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014). The plaintiff must further show that policymakers were "aware of the risk created by the custom or practice" and were "deliberately indifferent as to known or obvious consequences" of the practice. *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009).

Stewart argues that a number of Wexford's policies, practices, and customs consistently led to inadequate care and delays in his treatment and the treatment of other inmates. Specifically, Stewart cites issues such as Wexford's practice of "having nurses as the highest-level provider … at least 30% of the time[,]" delaying offsite appointments and x-rays, and generally delaying medical care through the collegial review process. Wexford responds to each of these arguments in turn, first noting that nurses are entirely qualified to evaluate injuries and make medical decisions related to physician referral. As to Wexford's alleged delays in scheduling and the collegial review process, Wexford cites other judges within this circuit who have found such practices to be constitutional and similar to practices employed by insurance companies. *See, e.g.*, *Howell v. Wexford Health Sources, Inc., et al.*, Case No. 16-cv-160-RJD, Doc. 167 (S.D. Ill. Oct. 10, 2019) (Daly, J.).

But these arguments by Wexford gloss over significant flaws that have been observed in Wexford's practices by courts in recent years. Most notably, voluminous discovery and multiple well-researched expert reports prepared for the Northern District of Illinois chronicled systematic failings in IDOC's health care system over a period of

years, specifically citing delays in the provision of offsite services and specialist care resulting from Wexford practices including collegial review. *Lippert et al. v. Ghosh et al.*, Case No. 10-cv-04603, Doc. 339 at 29, Doc. 767 at 63-64 (N.D. Ill.). Without going into exhaustive detail, *Lippert* is far from the only case to have observed delays and failings in the medical care provided by IDOC through Wexford.

Accordingly, it seems entirely plausible that a fact-finder presented with Stewart's case might conclude that his injury was caused by Wexford practices, that Wexford was aware of the risks arising from its practices, and that Wexford was deliberately indifferent to the consequences of those practices. Summary judgment for Wexford is denied.

## Conclusion

For the reasons set forth above, the Court **GRANTS** summary judgment to Lashbrook and **DENIES** summary judgment to the Wexford Defendants.

A telephonic status conference will be set by separate order for the purpose of setting a firm trial date.

**IT IS SO ORDERED.**

DATED: February 8, 2021

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**